UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

REDHAWK HOLDINGS CORP. and
BEECHWOOD PROPERTIES, LLC,                          Case No.: _____

                Plaintiffs,

    -against-                                        Civil Action

CRAIG INVESTMENTS, LLC and
HOWARD J. TAYLOR                                     **COMPLAINT**

             Defendants.
-----------------------------------------------------------------------x

       Plaintiffs, complaining of the defendants by their undersigned attorneys, state and allege as follows:

## JURISDICTION

       1.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331, in that one or more claims arises under the Constitution, laws, or treaties of the United States, and 28 U.S.C. § 1367, which vests this Court with supplemental jurisdiction over all other claims which do not so arise but which are related to said claims.

       2.     Jurisdiction in this court is also proper pursuant to 28 U.S.C. § 1332, in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States and/or citizens of different States and a citizen or subject of a foreign state.

## VENUE

       3.     Venue in this Court is proper pursuant to an exclusive choice of venue and consent to jurisdiction provision, at Section 5.9 of the Securities Purchase Agreement (the "*SPA*"), a copy of which is attached here as *Exhibit "A"*.

## PARTIES TO THE ACTION

4.     Plaintiff RedHawk Holdings Corp. (the "*Company*") is a publicly-traded Nevada corporation whose registered address and principal place of business are in Lafayette Parish, Louisiana. The Company's prior name, including while most of the events out of which this suit arises took place, was Independence Energy Corp.  Its principal places of business during that time first was in Orange County, California, and then, effective November 14, 2014, in St. Louis County, Missouri.

5.     Plaintiff Beechwood Properties, LLC ("*Beechwood*", collectively with the Company, "*Plaintiffs*") is a Louisiana limited liability company whose registered address and principal place of business are in Lafayette Parish, Louisiana.  Beechwood is a shareholder in the Company, owning approximately 35.4% of the outstanding shares of the Company as of June 25, 2015.

6.     On information and belief, Defendant Howard J. Taylor ("*Mr. Taylor*") is an individual of full capacity and the age of majority, and a resident of Leeds, England.

7.     On information and belief, and pursuant to public filings with the Missouri Secretary of State, Defendant Craig Investments, LLC ("*Craig Investments*"", collectively with Mr. Taylor, the "*Defendants*") is a limited liability company incorporated in Missouri whose principal place of business is in St. Louis County, Missouri.

## ALLEGATIONS

8.     According to the formation documents it filed with the Missouri Secretary of State, Craig Investments, LLC was formed October 16, 2014.

9.     At that time, Mr. Taylor was Chief Executive Officer (CEO) and a boardmember of the Company.

2342746

10.     At that time, Mr. Gregory Rotelli ("**Mr. Rotelli**"), not presently a party to this suit, was President, Chief Financial Officer (CFO), Secretary, Treasurer, and a boardmember of the Company.  Mr. Rotelli has submitted an affidavit concerning the events described herein, attached hereto as **Exhibit "B"**.

11.     Prior to that time, effective March 31, 2014, a group of investors including Beechwood and, initially, Mr. Taylor (excluding Mr. Taylor, the "**Beechwood Investors**"), entered into an agreement to purchase shares of stock in the Company.  Upon execution of this agreement, the Beechwood Investors were issued shares of stock in the Company pursuant to which they owned over 35% of the outstanding shares of stock of the Company.

12.     This agreement also gave the Beechwood Investors the right to appoint one boardmember to the Company's three-person board of directors (the "**Board**").  They appointed Mr. Dan Schreiber ("**Mr. Schreiber**").  The other two members of the Board were Messrs. Taylor and Rotelli.

13.     Pursuant to this agreement, Mr. Taylor also was named CEO and, as noted, was appointed to the Board of the Company.  Finally, Mr. Taylor was issued shares of the Company, causing him to own, at that time, over 6% of the Company.  As explained below, Mr. Taylor only retained these shares because of a fraudulent scheme he perpetrated against the Company, and his violation of federal securities laws, common law rules of fraud, and his fiduciaries duties he owed to the Company.  Consequently, as explained below, these shares and all appreciation in their value retained by Mr. Taylor constitute improper profits and ill-gotten fruits and gains from Mr. Taylor's fraudulent scheme, and should be disgorged by Mr. Taylor to the Company, or its investors including Beechwood.

2342746

14.     After their initial investment, the Beechwood Investors sought to purchase additional shares and increase their ownership stake in the Company.  Mr. Taylor was made aware of these efforts.

15.     Between March 31, 2014 and October 2014, Mr. Taylor had a falling out with his former investor group, the Beechwood Investors.

16.     This falling out led to business disagreements, and a number of legal disputes and accusations between Mr. Taylor and the Beechwood Investors.  In part, the Beechwood Investors came to believe that Mr. Taylor, in carrying out his duties as CEO, may have acted illegally and to defraud investors, and in violation of his duties of loyalty and care to the Company. Consequently, on information and belief, Mr. Taylor justifiably worried, or was apprised to worry, about his future with the Company and possible legal action that could be brought against him should the Beechwood Investors increase their ownership interest in the Company.

17.     One event that gave rise to these beliefs about Mr. Taylor occurred on or about June 2014.  Then, the Beechwood Investors learned of a scheme by Messrs. Taylor and Rotelli whereby those individuals planned to "assign" themselves a certain liability of the Company— the so-called Contender Note, discussed below—and then to convert that liability into preferred equity or voting rights to allow them to control the Company.

18.     As with the so-called "side deals" discussed below, Messrs. Taylor and Rotelli had not secured appropriate approval or consent for their scheme.  The Beechwood Investors, and the independent boardmember Mr. Schreiber, learned of it soon enough that they were able to compel Messrs. Taylor and Rotelli to reverse the transaction.

19.     Nonetheless, Mr. Taylor's illicit attempt to gain control of the Company in this manner—essentially by self-dealing in assets of the Company, without disclosure or approval to

the independent member(s) of the Board or the shareholders—effectively cemented the opinion of the Beechwood Investors regarding Mr. Taylor's stewardship of the Company. Henceforth, as Mr. Taylor was and would be aware, the goal of those investors was to increase their stake in the Company, with the intent of eventually removing Mr. Taylor from his positions as CEO and boardmember.

20. Meanwhile, by October 2014, the Company, and consequently Mr. Taylor on behalf of the Company, was essentially out of cash and desperately in needs of funds.

21. The Beechwood Investors made various offers to purchase additional shares from the Company to provide said funds, including an offer to purchase a total of approximately 18 million shares of stock in the Company for approximately $0.0035 per share, slightly below the publicly trading market price.

22. Had Mr. Taylor accepted this offer, the Beechwood Investors would have increased their ownership interest in the Company (though not acquired a majority interest). Accordingly, to protect his own future and interests, Mr. Taylor desired to avoid this transaction and instead sought funds for the Company from other sources.

### The Securities Purchase Agreement

23. As noted above, Craig Investments was formed October 16, 2014.

24. Effective November 12, 2014, the Company entered into a Securities Purchase Agreement (the "*SPA*", a copy of which is attached here as ***Exhibit "A"***) with two accredited investors, including Craig Investments (collectively the "***Craig Investors***").

25. According to the SPA, in exchange for $50,000 the Craig Investors would be issued 14,906,918 shares of common stock of the Company—a little under approximately 5% of

the Company, once the new shares were issued—and warrants to purchase up to an additional 7,452,969 shares of common stock of the Company.

26.    The transaction was executed and was disclosed to the public in a Form 8-K filed with the United States Securities and Exchange Commission (the **SEC**) on November 17, 2014, a copy of which is attached here as **Exhibit "C"**.

27.    The Form 8-K was signed by Mr. Rotelli.

28.    According to Mr. Rotelli, the Form 8-K was prepared solely by Mr. Taylor. (Exh. B, para. 14).

29.    The Form 8-K lists only one transaction between the Craig Investors and the Company—the aforementioned purchase of securities and warrants.

30.    The only other information disclosed in the Form 8-K was that the Company was changing its address and place of business to St. Louis, Missouri, the same county in which Craig Investments recently had been formed.

### The Undisclosed Side-Transactions

31.    The Form 8-K did not list the numerous other "side deals", in the words of Mr. Rotelli, that Craig Investments had executed and/or was contemplating with the Company and, separately, with its officers, Messrs. Taylor and Rotelli, in their personal and individual capacities (though regarding their roles and dealings with the Company).  None of these side deals was or would be disclosed to or approved by the Company (except to the interested officer engaged in the transaction), its shareholders, or the Board, including (not) to Mr. Schreiber, the only independent member of the Board who was not a party to any of these side deals.

32.    As to these side deals, first, on November 17, 2014—the same day the Company filed its Form 8-K concerning the purchase of securities by the Craig Investors—the Company

and Craig Investments entered into an "Assumption and Assignment of Debt," a copy of which is attached here as *Exhibit "D"*.

33.     As stated in the Assumption and Assignment of Debt, sometime in the past the Company alledgedly incurred a debt to a third-party, Contender Corp., ("*Contender*", referred to therein as the "Lender") and executed a note to Contender for that debt.  According to the Assumption and Assignment of Debt, the "Company is indebted to the Lender [Contender] for the sum of ONE HUNDRED AND FIFTY SIX THOUSAND SIX HUNDRED AND NINETY SEVEN (U.S.) DOLLARS (U.S. $156,697)" (defined in the Assumption and Assignment Debt as the "Outstanding Amount") (Exh. D, p. 1).

34.     Pursuant to the Assumption and Assignment of Debt, the Company agreed to assign, and Craig Investments agreed to accept, the "Outstanding Amount" and all of the Company's obligations therein "together with all evidences thereof and all rights and benefits of the Company pertaining thereto and proceeds derived therefrom, the 'Assigned Rights'". (Exh. D, p. 1).

35.     Craig Investments also agreed to "absolutely and unconditionally forever assume[] all of the Company's obligations in and to the Assigned Rights and any obligations to be derived therefrom with all responsibility in regards to payment of the Outstanding Amount and the interest accrued thereon." (*Id.*).

36.     The language of this instrument is more than a little confused, but its most natural reading indicates that Craig Investments agreed to assume the Company's obligation to pay Contender the amount due to it, should Contender ever appear and demand said payment under its note.

Page 7 of **35**

37.    Notably, that is all the Company *could* assign to Craig Investments under this agreement.  The Company was (purportedly) obligated to pay the debt to Contender; it had no right to *be* paid, or to direct to whom payment should be made.  According to the Assumption and Assignment of Debt, the claim to the amount owed as a debt and the right to be paid that amount under the note were owned by Contender, not the Company, and Contender was not a party to this Agreement.  So, those rights—the right to claim the amount purportedly owed as a debt, and to be paid the amount allegedly due under the note—could not be assigned and assumed under this agreement.

38.    In this context, Craig Investments interprets this instrument bizarrely.  It has made claims to the Company that, in the Assumption and Assignment of Debt, the Company assigned to Craig Investments its obligation to pay Contender.  Craig Investments therefore has indicated to the Company that the Company owes Craig Investments whatever amount the Company was indebted to Contender under the Contender note.

39.    Respectfully, Craig Investments' theory is poppycock.

40.    As noted above, it is axiomatic that a debtor owing a debt to one creditor cannot unilaterally assign that debt to another, new creditor.  A debt can only be assigned from one creditor to another with the consent of the original creditor.  Likewise, a new creditor can only "assume" the debt owed to an original creditor with the consent of that original creditor.  Absent the consent of the original creditor, the debtor can only assign, and a third-party can only assume, the debtor's *obligation to pay* the debt; a third-party can agree to pay the debt to the original creditor should that payment be demanded, but a debtor cannot assign to a third-party the original creditor's right to be paid the debt.

41.     Craig Investments has never indicated that it obtained Contender's consent to be assigned its right to receive payment of its debt.

42.     Moreover, Contender—apparently formerly incorporated in Belize—may have been dissolved, and no copy of the supposed note has been produced by Craig Investments or was attached to (or quoted in) the Assumption and Assignment of Debt; this calls the legitimacy of that debt into question, to put it mildly.

43.     Regardless, whatever may be owed to Contender, the Company has received no indication that Craig Investments ever obtained Contender's consent to the assignment of the debt owed to it, and without that consent Craig Investments cannot step into Contender's creditor-shoes by a unilateral contract with its debtor.

44.     The most logical interpretation of this agreement, if it is enforceable at all, is that it did what it stated it would do—under it, the Company assigned to Craig Investments its debt owed to Contender, and Craig Investments assumed the obligation to pay the Company's debt should Contender ever appear and demand it.

45.     The Assumption and Assignment of Debt, however, should not be enforced at all. First, it was not a legitimate contract with a proper business purpose. Instead, it was and is an attempt by a now-former officer of the Company, Mr. Taylor, in conspiracy with and aided and abetted by Craig Investments, to defraud the Company. The Assumption and Assignment of Debt was a side deal to Craig Investments' investment in the Company, but it was not disclosed in the SPA, nor in the Form 8-K, nor was it ever disclosed to or approved by the Board or the shareholders.

46.     Instead, through this undisclosed side deal, Defendants purported to agree to incur an additional liability on behalf of the Company to Craig Investments, granting Craig

Investments what it claims is a colorable claim against the Company worth at least $156,000. Craig Investments' entire investment in the Company was only approximately $25,000 (half of the total investment of the Craig Investors), and Mr. Taylor refused other financially comparable offers to accept that investment. Obviously, if this side deal were included Craig Investments' offer not only would not be the best offer available, it would result in a prohibitive -200% loss for the Company. This side deal was not a legitimate transaction, but part of a scheme by Mr. Taylor and Craig Investments to defraud the Company and its shareholders.

47.     In this regard, if one accepts Craig Investments' (incorrect) claim about the meaning and intent of this agreement, it is best understood as a kickback gifted to Craig Investments by Mr. Taylor to entice and reward them for investing in the Company, so Mr. Taylor did not have to accept the investment offer of the Beechwood Investors. Mr. Taylor, in conspiracy with and aided and abetted by Craig Investments, pursued this financially disastrous deal for his own personal benefit and gain, to prevent the Beechwood Investors from increasing their ownership stake and potentially threatening his livelihood and legal future, rather than for the benefit of the Company and its shareholders.

48.     Second, no consideration was included, or even purported to be included or paid, for the assignment in the Assumption and Assignment of Debt. For this reason alone, that agreement is unenforceable.

49.     Moreover, the lack of consideration within the four corners of that agreement supports the allegation above that that agreement was not a legitimate business transaction, but a side deal to the SPA, part of Craig Investments' investment in the Company and ultimately part of Defendants' scheme to defraud the Company.

Page **10** of 35

50.     As noted, the Assumption and Assignment of Debt was never disclosed to the independent boardmember, Mr. Schreiber.   It also was not disclosed to the shareholders, including in the Form 8-K filed with the SEC the very day the Assumption and Assignment of Debt was dated.

51.     Consequently, as a result of Defendants' fraudulent scheme, multiple investors, including Beechwood, purchased shares of the Company without knowledge of the undisclosed additional liability to—or claim to such a liability by—Craig Investments, purportedly worth at least $156,000.

52.     The only investor who knew of this liability was Craig Investments, who used this inside knowledge—with its illicit relationship with Mr. Taylor, with whom it was in conspiracy, and whom it was aiding and abetting, in conducting a scheme to defraud the Company—to purchase its shares at a price that was the lowest price the shares would be traded at for weeks before or after.

53.     In addition, Mr. Taylor's shenanigans with this agreement are reminiscent of his earlier efforts, discussed above, to use an assignment of the Contender Note to acquire preferred equity or voting rights in the Company.

54.     As alleged above, Mr. Taylor's goal in this earlier effort was to increase the voting rights of the Company owned by him and his then-collaborator, ultimately to give them control of the Company so Mr. Taylor's position with the Company could be protected, and he could avoid scrutiny of his handling of the Company's affairs.

55.     Mr. Taylor's then-collaborator, Mr. Rotelli, effectively had moved on.  However, through the Assumption and Assignment of Debt, Mr. Taylor—based on the erroneous interpretation and claims of Craig Investments—seems to believe he belatedly achieved his goal.

2342746

Mr. Taylor and Craig Investments apparently believe they used the Contender Note to increase the ownership stake in the Company owned by allies of Mr. Taylor, and specifically his now-conspirator, Craig Investments, by using the Assumption and Assignment of Debt to facilitate Craig Investments' investment in the Company.

56.     Like his earlier effort, Mr. Taylor's plan here was too cute by half; unauthorized by the appropriate organs of the Company, as was his earlier effort, this agreement is unenforceable for a variety of reasons, and even by its plain terms does not achieve Mr. Taylor's goal. Nonetheless, Mr. Taylor's repeated attempt to "assign" this liability of the Company for his personal gain further demonstrates his commitment to self-dealing and his scheme to defraud the Company, and reinforces Plaintiffs' contention here that Craig Investments' investment, facilitated by this side deal, never was a legitimate investment in the Company.

57.     Had Mr. Taylor not conspired with Craig Investments in a scheme to defraud the Company and benefit himself and themselves rather than the Company and its shareholders, Mr. Taylor would have obtained a higher price for Craig Investments' investment, as he was required to do, and should have done, under his fiduciary duties to the Company and its shareholders. Likewise, multiple other investors, including Beechwood, purchased shares of the Company without knowledge of this undisclosed liability, or claim to liability on behalf of Craig Investments.

58.     Defendants' lack of disclosure of this liability to all investors except Craig Investments artificially inflated the price of the shares purchased by all these investors without that knowledge. As discussed below and otherwise alleged herein, this conduct constitutes securities fraud, common law fraud, and a violation of Mr. Taylor's fiduciary duties, all of which Craig Investments conspired with Mr. Taylor and aided and abetted him in violating.

59. Second, on information and belief, on or soon after the date of the SPA and the Assumption and Assignment of Debt, Mr. Taylor entered into a Debt Purchase Agreement, or a similarly named agreement, whereby Mr. Taylor agreed to assign to Craig Investments his past and future, accrued and unaccrued, claims against the Company.

60. On information and belief, Among these claims was his claim against the Company for unpaid past and future compensation for his services rendered as CEO and/or a member of the Company's Board, for unreimbursed expenses, and for any severance to which he may have had a claim.

61. Mr. Taylor, ostensibly in his personal capacity, was engaging in a transaction with a major shareholder of the Company concerning his employment contract with the Company, debts allegedly owed to him by the Company, and his imminent disputes with the Company arising from the same, on information and belief, as part of his self-dealing with Craig Investments as an additional side deal to the SPA.

62. Nonetheless, neither Mr. Taylor nor Craig Investments disclosed this transaction to any other member of the Company, the Board, or the shareholders, much less sought or received their approval for this self-dealing.

63. Mr. Taylor was terminated as a boardmember on February 10, 2015, and as CEO on February 27, 2015. On May 4, 2015, Mr. Taylor entered into a settlement agreement with, *inter alia*, the Beechwood Investors (though not the Company) to settle claims arising out of his conduct as CEO. As part of the settlement, Mr. Taylor agreed he "hereby expressly waives any claim he may have or have had against [the Company] for any payment of any kind, including any claim for unpaid compensation, salary, severance, or other monetary damages of any kind."

64.     On information and belief, Mr. Taylor assigned his claims to Craig Investments prior to this settlement.  However, as stated, no notice was provided to any party to Taylor's settlement agreement—the Beechwood Investors—prior to the confection of the settlement, nor was notice provided to any other member of the Company (including Mr. Rotelli), the Board, or the Company's shareholders.  Accordingly, the settlement was entered into by the Beechwood Investors before they (or the Company, excluding Mr. Taylor himself) received notice of the assignment, so the assignment was not and is not effective.

65.     Regardless, Mr. Taylor agreed to assign to Craig Investments his claims in exchange for cash compensation, and in exchange for Craig Investments' investment in the Company.  Mr. Taylor thus engaged in self-dealing in conspiracy with and aided and abetted by Craig Investments.

66.     Further, on information and belief, this (undisclosed) agreement was part of Craig Investments' investment in the Company, another side deal to the SPA.  It thus was part of, and used to further, Defendants' scheme to defraud the Company, in violation of the federal securities laws, the state law of fraud, and the fiduciary duties Mr. Taylor owed to the Company, all of which Craig Investments conspired with and aided and abetted Mr. Taylor in violating.

67.     Third, effective January 26, 2014, Mr. Rotelli entered into a Debt Purchase Agreement with Craig Investments, a copy of which is attached here as ***Exhibit "E"***.

68.     In this agreement, Mr. Rotelli agreed to assign to Craig Investments his "Consulting Agreement" with the Company, purportedly "accruing at the rate of $7,500 dollars per month from the original date of the [consulting] agreement." (Exh. E, p. 1).  According to the agreement, "[a]s of December 31st, 2014, [the Company] still owes a balance due to [Mr. Rotelli] of $46,250.00." (*Id.*).

69. In this agreement, Mr. Rotelli also agreed to assign to Craig Investments "any other monies owed to [Mr. Rotelli] from [the Company], in any capacity or form, including equity, until such time that the Consulting Agreement is legally cancelled." (Exh. E, p. 1).

70. That this "Debt Purchase Agreement" was not and is not a legitimate business transaction is seen on its face, as it stated that the "Consideration to be paid to [Mr. Rotelli for this assignment] shall be a total of $2,000." (Exh. E, p. 1). In other words, in it Mr. Rotelli agreed to assign to Craig Investments, for a total of $2,000, an outstanding debt which already was worth $46,250 and was accruing further at the rate of $7,500 per month.

71. The reason for this discrepancy is that, essentially one week later, on February 2, 2015, Mr. Rotelli entered into a settlement agreement with, *inter alia*, the Beechwood Investors, in which Mr. Rotelli agreed that:

> Mr. Rotelli is and shall be entitled to no further payment, compensation, or severance, deferred or otherwise, for any services he provided to [the Company], [and] that the payment of Settlement Funds he shall receive pursuant to this Agreement … is sufficient to make him whole for all amounts he was, could be, or could have been owed by [the Company]… The Parties further agree that [the Company] is contemplated and intended to be a third-party beneficiary of this Agreement, such that, should Mr. Rotelli make any claim for payments or funds due or owed to him from [the Company] for services he allegedly rendered to it, then [the Company] shall be able to introduce and rely on this Agreement, and the consideration Mr. Rotelli received in it, as an absolute defense to his claim, and otherwise to enforce this provision of this Agreement against Mr. Rotelli.

72. No notice of any assignment of any claim of Mr. Rotelli was received by any of the Beechwood Investors (or the Company, excepting Mr. Rotelli himself) prior to this settlement. Accordingly, the assignment is not effective, and Craig Investments has no claim against the Company based on its acquisition of these claims.

73. Moreover, as stated in the affidavit of Mr. Rotelli and as evinced by the paltry $2,000 Craig Investments paid for a claim which the underlying document stated was worth

more than twenty times as much, Craig Investments was informed, and knew, about this imminent settlement when it purchased these claims. (Exh. B, para. 21).   Nonetheless, upon purchasing these claims it took no steps to provide notice to anyone of its acquisition.

74.     This is because this transaction was not a legitimate business transaction, but was instigated by Craig Investments (Craig Investments having approached Mr. Rotelli to purchase his claims) as another side deal to the SPA and another piece of their scheme to defraud the Company.

## Craig Investments' Inchoate Demands, and Their Impact

75.     As described above, by the end of February 2015, Messrs. Taylor and Rotelli had both resigned or been terminated from their positions with the Company.  By May, there seemed to be no more looming legal conflicts with these individuals.  Accordingly, the new officers and directors of the Company began to move the Company's businesses forward, including by planning to recapitalize the Company's balance sheet for future transactions and growth.

76.     In August 2015, the Company was contacted by Craig Investments, which asserted claims for monies owed based on the illicit and invalid agreements noted above, procured through Craig Investments' improper and fraudulent conduct.   Discussions have continued intermittently since without resolution.

77.     In the meantime, the inchoate threat of the claims of Craig Investments has prevented the Company from moving forward as planned, including by recapitalizing the Company's balance sheet for future transactions.

78.     As discussed below, and as stated in the affidavit of Mr. Rotelli, Craig Investments has indicated its intent to wait until the Company is recapitalized and poised for an imminent new transaction to raise its claims; Craig Investments apparently seeks the right to

engage in a figurative (but only barely…) form of extortion, in which it will wait until the Company has a new transaction imminent to threaten to file a suit that would torpedo the transaction, unless the Company agrees to settle its essentially frivolous claims. (Exh. B, para. 22).

79.     Craig Investments' posture has essentially paralyzed the Company's ability to move its business forward, causing it and its investors substantial harm.

80.     The Company has sought to resolve this impasse without litigation, including by repeatedly requesting documents or details to substantiate and allow it to evaluate Craig Investment's claims.  However, no documents or additional details have been provided.

81.     This is because, as stated above and in the affidavit of Mr. Rotelli, Craig Investments does not wish to pursue and have its claims evaluated legitimately; instead, it intends to wait until the Company has recapitalized and is pursuing an imminent transaction to assert its claims, in search of what would be, in the Company's view, a nuisance settlement.

82.     This strategy is particularly galling given that, as noted above, the Company and its investors are actually victims of a fraudulent scheme perpetrated by Craig Investments and Mr. Taylor, a scheme of undisclosed side deals, knowingly false SEC filings, and knowingly improper, unauthorized, and misleading agreements, including, as a result of the undisclosed side deals which Mr. Taylor engaged in to facilitate it, the SPA.

83.     The Company has suffered, and continues to suffer, harm and damage as a result of this scheme.

84.     Mr. Taylor and Craig Investments have both profited from their fraudulent scheme.  Craig Investments used—as it intended to use, and did in fact use—its fraudulent scheme to purchase shares from the Company, which shares it would not have been able to

purchase (because another offer would have been chosen), at a price it would not otherwise have received. It also was improperly gifted (without disclosure, though it appears most logically to have been a side deal to the SPA, if the Assumption and Assignment of Debt is enforceable at all) a liability on behalf of the Company which it claims the Company now owes to it, a claim it indicates is worth more than six times the mere $25,000 investment it made in the Company.

85.     Craig Investments was not chosen to invest in the Company for legitimate business reasons, but because of its willingness to engage in, and conspire in and aid and abet, a fraudulent scheme with Mr. Taylor; Mr. Taylor in turn rewarded Craig Investments for its cooperation and participation, including by allowing Craig Investments to purchase its shares at a price that was the lowest price the shares would be traded at for weeks before or after, and gifting it additional liabilities of the Company, purportedly worth far more than the investment itself, without disclosure or approval. Obviously, had Mr. Taylor not engaged in a fraudulent scheme to enrich himself and Craig Investments at the expense of the Company and its investors, in conspiracy with and aided and abetted by Craig Investments, he could have obtained a better price for the investment the Company was seeking, on essentially the terms of a legitimate SPA without ruinous undisclosed side deals, and without the burden of these side deals on the Company's ability to conduct business ever since.

86.     By placing his own interests above the interests of the Company and its shareholders. Mr. Taylor obviously engaged in self-dealing and breached the fiduciary duties he owed to the Company, and he did so in conspiracy with, and aided and abetted by, Craig Investments, which is jointly and severally liable for all harm and damage caused by this scheme.

87.     In addition to enriching himself directly, Mr. Taylor's fraudulent scheme allowed him to raise capital—at the long-term financial expense of the Company, because of the undisclosed side deals that accompanied that investment—that the Company needed at the time, without accepting an investment from the Beechwood Investors. This allowed him to hang on as CEO for a significant additional period—increasing his potential claims against the Company for accrued salary, and allowing him to continue to waste the Company's assets and engage in self-dealing to enrich himself and Craig Investments—and ultimately to negotiate a more favorable settlement for himself upon his termination.

88.     Despite his past conduct, and what is now known about the harm it caused to the Company and its shareholders, his position gave him leverage when negotiating his settlement with the Beechwood Investors (but not the Company, which has not released its claims against Mr. Taylor). As a result, Mr. Taylor was allowed to retain the shares he had acquired in his original investment with the Beechwood Investors, almost 6% of the Company at the time.

89.     In other words, if not for their fraudulent scheme, Craig Investments would not have acquired, and Mr. Taylor would not have retained, the shares in the Company they have owned since the events described above took place.

90.     No thanks to Craig Investments or Mr. Taylor, since Mr. Taylor was terminated the value of their shares has appreciated considerably. The value of their shares—absolutely given the role of Mr. Taylor's and Craig Investments' fraudulent scheme in their acquisition and retention of their shares, and, separately, their appreciation in value since the fraudulent scheme was conducted—constitutes improper profits and ill-gotten fruits and gains of a fraudulent scheme that Mr. Taylor and Craig Investments must disgorge to the Company and/or its investors.

91.     Finally, Craig Investments claims multiple other benefits as a result of the fraudulent scheme, particularly the claims it makes under the agreements it executed as improper and undisclosed side deals to the SPA.  As explained above, even putting aside their origins in, and role in furthering, a fraudulent scheme, on their own none of these agreements is enforceable, pursuant to fundamental rules of contract law.

92.     Nonetheless, should this Court find any of these agreements or side deals are enforceable in any way to the benefit of Craig Investments (which it should not), then these benefits would constitute improper profits and ill-gotten fruits and gains of a fraudulent scheme, which this Court should order disgorged and forfeited.

## CLAIMS

93.     Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs "1" through "92" herein-above, and based thereon respectfully assert the following claims against Defendants:[1]

### Claim 1: Securities Fraud under the Federal Securities Laws.

94.     Section 10(b) of the Securities Exchange Act of 1934,[2] and its implementing rule Rule 10b-5,[3] prohibit deceptive or manipulative acts in connection with the purchase or sale of any security, and provide a private right of action for violations of this prohibition.

---

[1]     Beechwood acknowledges it settled with Mr. Taylor for "all claims arising out of any action taken by Mr. Taylor … as [CEO] of [the Company] prior to the date of" the settlement, May 4, 2015.  There is no settlement, or other release, between Mr. Taylor and the Company.  Accordingly, unless otherwise indicated, Beechwood only lodges these claims against Craig Investments, while the Company lodges these claims against both Defendants.

While Beechwood only lodges its claims against Craig Investments, please note the settlement with Mr. Taylor does not eliminate the fact of Mr. Taylor's underlying conduct.  Consistent with the settlement, Plaintiff Beechwood does not seek to hold Mr. Taylor liable for this conduct here.  However, Beechwood makes these allegations against Mr. Taylor to support its claims against Craig Investments, for its participation in Defendants' fraudulent scheme, and its conspiracy in and aiding and abetting of Mr. Taylor's conduct.

95.     The many undisclosed side deals executed by Mr. Taylor and Craig Investments including their failure to disclose the agreements themselves or their legal consequences—as with the execution of the Assumption and Assignment of Debt, which was a side deal to the SPA not disclosed in the SPA or the Form 8-K filed the day it was executed, which materially altered the terms of the SPA without disclose to, or approval of, the Board of the Company's shareholders, and which according to Craig Investments, exposes the Company to an additional undisclosed $156,000 liability—constitute knowingly false and deceptive misrepresentations and omissions of material facts pursuant to these provisions.

96.     Likewise, and more simply, Mr. Taylor knowingly caused to be filed an inaccurate Form 8-K filed with the SEC with regard to the investment of the Craig Investors in

---

[2]     15 U.S.C. § 78j provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-- ....

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[3]     17 C.F.R. § 240.10b–5 provides in pertinent part that;

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

2342746

the Company. This is a knowing misrepresentation pursuant to Section 10(b) and Rule 10b-5(b), pursuant to the above.

97.    Further, the conspiracy between Craig Investments and Mr. Taylor described above constitutes a "scheme" to defraud investors pursuant to Rule 10b-5(a) and (c).

98.    These misrepresentations and omissions and this scheme damaged both the Company and its investors, and Defendants are jointly and severally liable to Plaintiffs for the damages they caused. Further, these misrepresentations and omissions and this scheme also allowed Defendants to acquire substantial improper profits and ill-gotten fruits and gains, which should be disgorged.

99.    Further, the Company and its investors, including Beechwood, justifiably relied on the knowing misrepresentations and omissions and deceptions of this scheme in acquiring shares during this time period. Meanwhile, Craig Investments knowingly and willfully acquired and used insider information to acquire its shares, including regarding the alleged liability of the Company to Craig Investments pursuant to the Assumption and Assignment of Debt, which was disclosed to, and known by, no other investor than Craig Investments.

100.    As a result of these misrepresentations and omissions and this fraudulent scheme, Defendants are liable for the damages they caused the Company's investors, and Craig Investments must disgorge the improper profits and ill-gotten fruits and gains it acquired, obtained, or received.

## Claim 2: Common Law Fraud, Conspiracy to Commit Common Law Fraud, and Aiding and Abetting Common Law Fraud.

101.    As alleged above, Defendants knowingly made misrepresentations and acted deceptively with the intent to perpetrate a scheme to defraud the Company, its Board, and its

shareholders, all of whom were so defrauded as Defendants intended, resulting in damage to the Company and its investors, including Beechwood.

102.   In addition, and alternatively, to the extent Mr. Taylor was the party designing, leading, and/or perpetrating the fraudulent scheme against the Company of which he was CEO, he was acting in concert and conspiracy with Craig Investments and its principals, and Craig Investments knowingly aided and abetted Mr. Taylor's fraud.

103.   As alleged above and below, the effects of this fraudulent scheme are still occurring and being felt today, as the improper and undisclosed side deals to the SPA that Craig Investments executed with and through Mr. Taylor have essentially paralyzed the Company's ability to resume normal business operations, and caused, and continue to cause, the Company and its shareholders to incur substantial costs and expenses, including in investigating, preparing, and litigating this action.

104.   Moreover, this fraudulent scheme has resulted in substantial improper profits and ill-gotten fruits and gains for Defendants, including the value of each Defendant's shares in the Company, and various other payments they have received and/or claim to be owed to which they were not and are not entitled.

105.   These damages should be recompensed, and these improper profits and ill-gotten gains disgorged to the Company, or to the Company's shareholders including Beechwood

## Claim 3: Breach of Fiduciary Duty, Conspiracy to Breach Fiduciary Duty, and Aiding and Abetting a Breach of Fiduciary Duty.

106.   As the CEO of the Company, Mr. Taylor had fiduciary duties of loyalty and due care, among others, to the Company.  Mr. Taylor had similar duties as a boardmember of the Company.

2342746

107.    As alleged above, Mr. Taylor knowingly, willfully, and intentionally, or alternatively at least recklessly, gross negligently, or negligently prioritized his personal interests and benefit over those of the Company and its shareholders.  He did this, for instance, by pursuing and choosing the investment of Craig Investments rather than the other, legitimate investment offers he had received, to protect his personal interests.

108.    Mr. Taylor had an obligation to consider these offers in light of the best interest of the Company and its shareholders.  He refused to consider offers from certain investors, not because of any interest of the Company but because of a desire to protect his own interests.

109.    When Mr. Taylor could not secure an investment comparable to the offers he had received, he pursued the investment from Craig Investments through improper, and ultimately illegal, means, including by gifting Craig Investments, without disclosure or approval, a liability of the Company which Craig Investments claims should cost the Company more than six times the value of the $25,000 investment Mr. Taylor used it to secure.

110.    Mr. Taylor's prioritization of his own interests over those of the Company and its shareholders constitutes a breach of the fiduciary duty of loyalty he owed the Company.

111.    Mr. Taylor's eventual illegal conduct, and the acts he took in furtherance of his scheme with Craig Investments without disclosure to, much less the consent or approval of, the Board or the Company's shareholders, constitutes a breach of the fiduciary duty of care he owed the Company.

112.    Mr. Taylor committed these violations with the knowledge, encouragement, and assistance of, and in conspiracy with and aided and abetted by, Craig Investments.

113.    As evinced by the failure to disclose the Assumption and Assignment of Debt and other side deals in the SPA to which Craig Investments was a party, and then in the Form 8-K,

2342746

Craig Investments had knowledge of, encouraged, and willfully furthered Mr. Taylor's efforts to pursue an alternative investment to the offers he had received, including ultimately by obviously illegal methods such as undisclosed side deals that Craig Investments purports granted it a liability of the Company worth more than six times its $25,000 investment.

114.    Likewise, and again with the knowledge of, and in conspiracy with and aided and abetted by Craig Investments, Mr. Taylor willfully deceived the Company, the Board, and its shareholders by not disclosing the "side deals" to the SPA that significantly and materially altered the terms of the investment of the Craig Investors.

115.    In so doing, Mr. Taylor violated the fiduciary duties of due care and loyalty he owed to the Company, and Craig Investments conspired in, and aided and abetted, that violation, as well as by the other facts alleged above.

116.    Craig Investments conspired in and aided and abetted these violations by knowingly—with knowledge of the violations and the role of its conduct in furthering them— and intentionally assisting and acting to further Mr. Taylor's violations because it and Mr. Taylor benefited from them.

117.    Craig Investments did this, in part and for instance as alleged above, by engaging in improper and undisclosed side deals with Mr. Taylor.

118.    The impropriety of these side deals was obvious, as was the impropriety of their nondisclosure, as evinced by the failure to include or mention any of them in the SPA, which purported to memorialize the terms of Craig Investments' investment in the Company.

119.    Craig Investments engaged in them, with Mr. Taylor, knowingly, intentionally, and willfully, because it knew it was being granted, and it sought, terms to which it was not entitled and which it should not be granted, but from which it and Mr. Taylor could profit and

benefit; as this benefit was gained to the detriment of the Company and its shareholders, the nondisclosure was necessary, and willfully engaged in, and furthered, by Craig Investments.

120.    Craig Investments also did this, in part and for instance as alleged above, by engaging in transactions with Mr. Taylor, as well as Mr. Rotelli, purportedly in their personal capacities but regarding their contracts and dealings with the Company, without disclosure to or the approval of the Company's Board or shareholders.

121.    Craig Investments engaged in these transactions to further the fraudulent scheme of it and Mr. Taylor.

122.    Craig Investments knew the individuals with whom it was dealing would shortly settle their claims against the Company, but it bought their claims anyway, in part to harass the Company as part of a nuisance suit in the future, as described above, and in part to gift a kickback to Mr. Taylor, in exchange and gratitude for the grift Mr. Taylor improperly had given it.

123.    All of these actions constituted violations of the fiduciary duties Mr. Taylor owed the Company, and Craig Investments further, conspired in, and aided and abetted, these violations.

124.    These violations which Mr. Taylor committed in conspiracy with, and aided and abetted by, Craig Investments damaged, and continue to damage, the Company and its investors, for instance, through the uncertainty and cost of this litigation, the creation of various undisclosed liabilities allegedly owed by the Company, and the acceptance of an investment from Craig Investments instead of a superior offer from other investors which, in addition to simply procuring more money for the investment would have saved the Company from those side deals and undisclosed liabilities.

125.    Mr. Taylor and Craig Investments have also received improper profits and ill-gotten fruits and gains from these violations, as alleged above.

126.    Defendants are jointly and severally liable to compensate Plaintiffs for these damages, and to disgorge to the Company and/or its investors these profits, fruits, and gains.

## Claim 4: Declaratory Judgment

127.    This claim is made solely by the Company against Craig Investments.

128.    As noted above, continually and repeatedly for the last several weeks or months, Craig Investments has indicated to the Company that the Company owes Craig Investments debts under numerous claims. These claims essentially all arise from improper and undisclosed side deals to the SPA entered into as part of Defendants' fraudulent scheme, as alleged above.

129.    For this reason—because these side deals were and are a part of Defendants' scheme to defraud the Company—these side deals, and Craig Investments' claims arising from them, are unenforceable.

130.    Regardless of the fraud, as alleged above most of the side deal agreements were too clever by half and do not, and could not, have the legal effect Craig Investments claims.

131.    This is so with regard to the Assignment and Assumption of Debt whereby Craig Investments claims the Company assigned it Contender's claim and right to be paid by the Company, which claim and right cannot be assigned without Contender's consent, and which anyway is nowhere evinced in that agreement.

132.    As noted above, this agreement also is unenforceable because it lacks consideration, because of the illegitimacy of the purported underlying debt, and because Craig Investments' interpretation of it is utterly and completely asinine and absurd.

133.    This is likewise so with regard to the assignments to Craig Investments of the claims, debts, and/or agreements of Messrs. Rotelli and Taylor with the Company.

134.    All of these claims were settled by Messrs. Rotelli and Taylor before notice of the assignment was given to the parties to that settlement, or, except for the officer who executed the assignment, to the Company, making these assignments ineffective and the claims unenforceable.

135.    Moreover, Craig Investments purchased these claims knowing these settlements were imminent (as evinced by the paltry price paid for the allegedly hugely valuable claims), yet it took no steps to provide the requisite notice, bolstering the notion that it did not acquire them for a legitimate business reason, but to use in a nuisance suit against the Company and to provide a kickback to Mr. Taylor in furtherance of their fraudulent scheme.

136.    Craig Investments refuses to acknowledge the unenforceability of these claims, agreements, and side deals, or even the basic groundlessness of its claim to have stepped into Contender's shoes and acquired its right to be paid the debt owed to Contender, without Contender's consent through an agreement to which Contender was not a party.  Instead, Craig Investments continues to claim—based on ever-changing theories and for ever-varying and inconsistent amounts—that it is owed a significant sum of money by the Company for its claims arising from its improper and undisclosed side deals.

137.    As described above, when pressed Craig Investments refuses to provide either substantiating documents or details to support its claims; various of the agreements attached here are only signed by one party because the Company does not have executed copies of the agreements in its position (Mr. Taylor not having been able to provide them from his records when he supposedly turned over the books and records of the Company following his

termination...) and Craig Investments refuses to provide them (assuming such executed copies exist, which the Company does not admit—reserving its right as to all arguments and defenses arising from said lack of execution should it be shown later—but it assumes for the purposes of this Complaint based on Craig Investments' repeated insistence and claims).

138.   As further described above, the threat of these inchoate claims cripples the ability of the Company to move forward with its business.   In particular, these claims allow—and as described in the affidavit of Mr. Rotelli, such actually was and is the plan of Craig Investments— Craig Investments to wait until the Company is recapitalized and has an important transaction imminent before raising them, potentially torpedoing the transaction unless the Company gives in to this figurative extortion.

139.   Accordingly, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, the Company respectfully prays for a determination from this Court regarding the parties' respective rights under the above referenced transactions and agreements, and any others which may come to light or be raised by Craig Investments during this proceeding.   Plaintiffs respectfully suggest that, once all the evidence is organized, Craig Investments will be found to have no claim against the Company, and in fact, pursuant to the claims above, will owe the Company a considerable amount for its direct role in the fraudulent scheme, and for conspiring in and aiding and abetting Mr. Taylor's violations.

### Claim 5: Breach of Contract

140.   As noted above, the transaction purported to be memorialized in the Securities Purchase Agreement was not the (full) transaction Craig Investments claims to have entered into with the Company.   Instead, Craig Investments claims (wrongly) to have acquired, through

various unauthorized and undisclosed side deals to the SPA, certain claims, obligations, and liabilities of the Company entitling it to a payment from the Company many times greater than its investment in the Company.

141.   These side deals, and Craig Investments' interpretation of its entitlement to these claims, obligations, and liabilities, were not properly authorized by the Board of the Company or its shareholders.  They also violate federal securities laws and state law of fraud, materially alter the parties' financial conditions, and abrogate the terms of the SPA without authority, in the process violating the parties' representations and warranties in the SPA, among other provisions.

142.   Craig Investments knew of these defects with the side deals at the time it entered into the SPA, as shown by the fact that the (undisclosed) Assumption and Assignment of Debt was executed the day the Form 8-K disclosing the SPA was filed.  From the beginning, Craig Investments worked with Mr. Taylor to hide these side deals and prevent their timely disclosure, and to make them seem authorized and enforceable even though they are not.

143.   Again, Craig Investments thus directly acted to further its fraudulent scheme with Mr. Taylor, and conspired with and aided and abetted Mr. Taylor in his own violations.

144.   Regardless, for the reasons stated above, the side deals and Defendants' fraudulent scheme violated and caused a breach of the SPA, which violation and breach, and whose fraudulent intent and result, were planned and intended by Craig Investments at the time it executed the SPA.

145.   Put simply, given the claims and demands of Craig Investments, the SPA is, and always was, in tatters; the transaction purportedly memorialized in the SPA is not remotely the transaction Craig Investments claimed, from the beginning to have entered into with the Company.

146. Given the above, a proper remedy is to rescind the SPA and unwind Craig Investments' investment in the Company: Craig Investments should return its shares to the Company in exchange for the purchase price it paid for those shares, after deducting any and all amounts owed or that should be credited or paid to the Company, pursuant to the above claims and/or pursuant to the dispute resolution provision of the SPA which, should the Company prevail, expressly provides for the Company's recovery of its reasonable attorneys' and the other costs and expenses it has incurred in investigating, preparing, and prosecuting this action.

### Claim 6: Alter Ego and/or Piercing the Corporate Veil

147. As noted above, Craig Investments was only formed October 16, 2014, less than a month before Craig Investments' investment in the Company.

148. As likewise noted above, Craig Investments' investment in the Company was part of a fraudulent scheme from the start, with Craig Investments and Mr. Taylor not even waiting until the Form 8-K for the SPA was filed to enter into the (undisclosed) Assumption and Assignment of Debt.

149. Craig Investments has since continued to further this fraudulent scheme, directly, and in conspiracy with and by aiding and abetting Mr. Taylor's own fraudulent conduct.

150. Accordingly, Craig Investments, LLC was only formed by its principals to facilitate and further a fraud.

151. This is an improper reason for forming an LLC, and an axiomatic basis for piercing the company's corporate veil and/or applying alter ego theory to hold a company's principals personally, and jointly and severally, liable for its debts, and specifically for the damages caused by the fraud which Craig Investments was formed and used to perpetrate, and

any funds or profits these principals have received as a result of the fraudulent scheme that must be disgorged.

152.    Accordingly, should this Court rule that Plaintiff(s) are entitled to a Judgment against Craig Investments, then Plaintiffs respectfully request that, after due proceedings be had, including to determine the number and identity of the members of Craig Investments, that this Court rule that the corporate veil of Craig Investments, LLC should be pierced and/or its corporate form disregarded based on alter ego principals, and the owners and/or principals of Craig Investments, LLC should be liable for this judgment jointly and severally, and in their personal and individual capacities.

## DAMAGES AND PRAYER FOR RELIEF

153.    As alleged above, both Plaintiffs suffered a variety of damages, including, without limitation, direct, out-of-pocket, indirect, consequential, operating losses, and "benefit of the bargain" damages.

154.    Plaintiffs are entitled to, and respectfully pray for a judgment awarding them, these and any other damages to which they have a legal right, at least in the amount of the several hundred thousands of dollars of improper profits and ill-gotten gains procured by Defendants as a result of their fraudulent scheme and other violations, and in a final amount to be determined and proved at trial.

154.    In addition, Plaintiffs are entitled to pre-and post-judgment interest and costs.

155.    In addition, pursuant to the dispute resolution provision of the SPA, the Company, should it prevail, is entitled to recover from Craig Investments and/or Mr. Taylor its "reasonable

2342746

attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding." (Exh. A, sec. 5.9).

156.    In addition, as noted above, Plaintiffs are entitled to rescission of the SPA and an award of costs and expenses, including their reasonable attorneys' fees, pursuant to that dispute resolution provision.

157.    Plaintiffs respectfully request whatever other relief to which they may be entitled, and for this Court to assess and apply against Defendants whatever other penalties, fees, and/or consequences may be warranted, in law or in equity and in contract or by operation of law, in this Court's sound discretion and judgment.

Dated: New York, New York          MASSOUD & PASHKOFF, LLP
      November 18, 2015          Attorneys for Plaintiffs


By:_____
      Ahmed A. Massoud, Esq.
      AAM:5361
      1700 Broadway
      41st Floor
      New York, New York 10019
      (212) 207-6771